## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASSOCIATED MORTGAGE BANKERS, INC.**, )<br>2395 Ocean Avenue, Suite 5, )<br>Ronkonkoma, New York 11779, on behalf of itself )<br>and a class of similarly-situated mortgage lenders, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>**BEN CARSON**, in his official capacity as )<br>Secretary of the U.S. Department of Housing )<br>And Urban Development, )<br>451 7th Street, S.W., )<br>Washington, D.C. 20410, and )<br> )<br>**U.S. DEPARTMENT OF HOUSING AND** )<br>**URBAN DEVELOPMENT**, )<br>451 7th Street, S.W., )<br>Washington, D.C. 20410, )<br> )<br>Defendants. )<br>_____) | Case No. |

## COMPLAINT

### INTRODUCTION

Plaintiff Associated Mortgage Bankers, Inc. ("AMB") is back before this Court to seek review of an administrative decision by the Department of Housing and Urban Development ("HUD"), after this Court vacated HUD's prior decision due to the deciding official's lack of a proper appointment. Unfortunately for AMB, the new Administrative Law Judge ("ALJ"), in a Decision and Order on Remand dated February 28, 2020 (the "Decision"), committed numerous errors of law and completely disregarded undisputed evidence proffered by AMB.[1] However, unlike the prior proceeding, wherein HUD deliberately refused to divulge its policies and

---

[1] A copy of the Decision and Order on Remand, dated February 28, 2020, is attached as Exhibit 1.

procedures regarding its mortgage note sale program, in the new proceeding HUD was ordered to provide such information.  It is now an undisputed fact that HUD violated its own policies and procedures in conducting the mortgage note sales program, that the note at issue in this litigation should not have been included in the bulk note sale, and that no claim should have ever been filed by the servicer.  In turn, AMB is not obligated to indemnify HUD for HUD's own mistakes.  In spite of HUD's misconduct, and the clear and obvious effect that such conduct had on reducing the recovery, the ALJ adopted the position that HUD can simply do whatever it wants.  But that is not the law, and that is not acceptable conduct for an agency of the Executive Branch.

It is noteworthy that in his Decision, the ALJ, like the Chief HUD ALJ before him, continues to suggest that this Court erred in its prior ruling regarding the lack of a proper constitutional appointment of the prior Administrative Judge.[2]  In connection with the prior action, AMB sought to have an ALJ outside of HUD assigned to hear this matter.  This Court denied that motion and, as AMB anticipated, the new ALJ arbitrarily – and capriciously – rejected every argument proffered by AMB.  As explained more fully below, HUD took a property valued at $550,000 and improperly sold it as part of a bulk sale of defaulted notes for $360,531.24 (66% of its value, or approximately $190,000 less than the property was worth).  While the ALJ found that there is "no question" that including the note in the bulk note sale was in violation of HUD's own policy and procedures, the ALJ excused HUD's conduct by erroneously finding that AMB never asserted that HUD's conduct had any effect on the enforceability of the Indemnification

---

[2]  In his Decision, the ALJ states that the Supreme Court's decision in *Lucia v. SEC*, 585 U.S. _, 138 S. Ct. 2044 (2018), "pertains specifically to administrative law judges, and arguably does not require administrative judges such as Judge Hall to be appointed in conformance with the Appointments Clause." *Id.* at 1, n.1.  The ALJ fails to recognize, however, that HUD's Administrative Judges are "inferior officers" under *Lucia* because of, among other things, their authority to issue a final agency decision in administrative offset cases which is not subject to further review by the Secretary of HUD.  The ALJ's assertion that the title of the position is determinative, rather than the significance of the authority the AJs wield, is without merit.

Agreement. Moreover, HUD's confusion over how to execute its loan sale program can be understood in part since HUD was obligated to promulgate regulations governing the program through notice and comment rulemaking, yet did not, and instead continues to operate this program covering billions of dollars of Government assets illegally under the guise of a demonstration project. Because AMB had agreed to indemnify HUD for any losses suffered in connection with the legitimate liquidation of this particular loan, HUD's misconduct in failing to properly liquidate the collateral means that AMB must suffer the consequences–to wit, it must pay HUD's losses in the amount of $174,918.20 plus interest accruing at the rate of 5% from February 25, 2015.

AMB filed a timely administrative appeal objecting to HUD's outrageous conduct. As it turns out, HUD has treated a number of other lenders in a similar manner. In order to stop this misconduct—the prohibited practice of giving away the collateral for loans with indemnification agreements as part of bulk note sales—AMB, on behalf of itself and a class of similarly-situated lenders, bring this class action seeking declaratory and injunctive relief as well as restitution and disgorgement against defendants Ben Carson, in his official capacity as Secretary of the United States Department of Housing and Urban Development, and the United States Department of Housing and Urban Development, for their violations of the Administrative Procedure Act ("APA") (5 U.S.C. § 551, *et seq.*), as well as the statute and regulations governing administrative offsets and HUD's implementing regulations on administrative offsets (31 U.S.C. § 3701, *et seq.*; 24 C.F.R. § 17.61, *et seq.*).

## PARTIES

1.     AMB is incorporated under the laws of New York, with its principal place of business in Ronkonkoma, New York.

2.      AMB originates mortgage loans, including mortgages that are and were eligible for insurance under the Federal Housing Administration ("FHA") insurance program administered by HUD.

3.      AMB is and was at all times relevant to these allegations an FHA-approved mortgagee and subject to regulation by HUD.

4.      Ben Carson is the Secretary of HUD, and he is named only in his official capacity.

5.      HUD is an agency of the United States government with its headquarters at 451 7th Street, S.W., Washington, D.C. 20410.

## JURISDICTION, VENUE, AND
## WAIVER OF SOVEREIGN IMMUNITY

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides district courts with original jurisdiction over all civil actions arising under the laws of the United States.

7.      Venue is proper in this Court under 28 U.S.C. § 1391, which provides that a civil action in which a defendant is an officer or agency of the United States may be brought in any judicial district in which a defendant resides.

8.      HUD's sovereign immunity with respect to this suit is waived by the Administrative Procedure Act, 5 U.S.C. § 702, and the National Housing Act, 24 U.S.C. § 1702.

## FACTUAL BACKGROUND

### *FHA Mortgage Insurance*

9.      FHA was created by Congress in 1934, and became part of HUD's Office of Housing in 1965.

10.     FHA provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories.

4

11.     According to HUD's website, the "FHA insures mortgages on single family homes, multifamily properties, residential care facilities, and hospitals.  It is one of the largest insurers of mortgages in the world, insuring more than 46 million mortgages since its inception in 1934.  *See* https://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/fhahistory (last visited Mar. 10, 2020).

12.     HUD's website states: "FHA mortgage insurance provides lenders with protection against losses if a property owner defaults on their mortgage.  The lenders bear less risk because FHA will pay a claim to the lender for the unpaid principal balance of a defaulted mortgage. . . . FHA is the only government agency that operates from its self-generated income.  The Mortgage insurance premiums it collects from borrowers via lenders are used to operate the program."  *See Id.*

13.     The account from which FHA pays insurance claims is known as the Mutual Mortgage Insurance Fund (the "MMI Fund").

### *FHA Insurance Claims*

14.     When loans subject to FHA mortgage insurance default, the mortgage holder or servicer will generally foreclose on the property or obtain a deed-in-lieu of foreclosure.

15.     The mortgage holder or servicer will then generally make an insurance claim to FHA for its losses incurred in connection with the default on the mortgage and will convey title to the property to HUD in return.

16.     HUD will then generally dispose of any collateral it receives in exchange for paying an insurance claim in order to recoup its losses due to paying the insurance claim.

### *HUD's Rulemaking Requirements*

17.     As a general matter, "notice of proposed rule making shall be published in the Federal Register," including "reference to the legal authority under which the rule is proposed" and "the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).

18.     After providing notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," and "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).

19.     The APA provides that agencies normally do not need to engage in notice and comment rulemaking in connection with "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a)(2).

20.     However, HUD's regulations governing "Rulemaking: Policy and Procedures" provide that "[i]t is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts *even though such matters would not otherwise be subject to rulemaking by law* or Executive policy."  24 C.F.R. § 10.1 (emphasis added).

21.     HUD's regulations also provide that "notice and public procedure will be omitted if the Department determines in a particular case or class of cases that notice and public procedure are impracticable, unnecessary or contrary to the public interest.  In a particular case, the reasons for the determination shall be stated in the rulemaking document."  24 C.F.R. § 10.1.

### *Rulemaking on HUD's Accelerated Claims Disposition Program*

22.     In 2002, HUD began exploring a new program, known as Accelerated Claim Disposition ("ACD"), to dispose of collateral it received after paying insurance claims.

23.     The program has been identified by HUD by a number of names over time, and by different names at the same time, including: Accelerated Claim Disposition; Accelerated Claim and Asset Disposition; Single Family Joint Venture Loan Sales; Single Family Loan Sales ("SFLS"); Single Family Mortgage Acquisition and Recovery Initiative; and Distressed Asset Stabilization Program.

24.     In February 2002, HUD issued a "Notice of FHA Accelerated Claims Disposition Demonstration" (the "February 2002 Notice"), a program under which "HUD would pay accelerated claims on certain defaulted FHA-insured mortgages."  67 Fed. Reg. 5,418 (Feb. 5, 2002).

25.     The February 2002 Notice requested comments on the ACD demonstration program.

26.     In October 2002, HUD published a final "Notice of FHA Accelerated Claims Disposition Demonstration" which formally established the demonstration program (the "October 2002 Notice").  67 Fed. Reg. 66,038 (Oct. 29, 2002).

27.     With respect to which loans qualified for the program, the October 2002 Notice added a requirement that "[t]o the knowledge of the participating mortgagee, the mortgage loan is not subject to an Indemnification Agreement as of the provisional claim approval date."  67 Fed. Reg. at 66,041.

28.     HUD stated that the success of the program would be evaluated based on "whether the use of the ACD process will: (1) reduce loss rates; (2) reduce the cost and time associated with

claim dispositions; and (3) enhance the ability of HUD to assess risk and manage the FHA mortgage insurance fund."  67 Fed. Reg. at 66,041.

29.     The October 2002 Notice stated that, with respect to "evaluating the success of the ACD Demonstration," "[a] summary of the results of the evaluation will be published in the Federal Register."  67 Fed. Reg. at 66,040.

30.     No "summary of the results of the evaluation" of the ACD program was published in the Federal Register.

31.     HUD conducted four sales under the ACD demonstration program, in 2002, 2003, 2004, and 2005.

32.     A brochure for the 2002 ACD sale noted that "[t]he goals of this new program are to shorten the timeframe in which servicers can file a claim for defaults; to address defaults by aligning private sector interests with HUD's objectives; to reduce HUD's REO portfolio; to increase the value of single-family assets and the recovery to HUD; and to produce savings to HUD."  *See* https://portal.hud.gov/hudportal/documents/huddoc?id=DOC_14522.pdf (last visited Mar. 10, 2020).

33.     In a 2006 "Semiannual Regulatory Agenda" (the "2006 Agenda"), HUD stated that it sought "comments on HUD's Accelerated Claim and Asset Disposition Demonstration (ACD) program before the Department proceeds to issue a proposed rule to codify the requirements for the ACD program, making it a permanent part of HUD's single family mortgage insurance programs."  71 Fed. Reg. 22,734, 22,743 (April 24, 2006).

34.     According to the 2006 Agenda, "[t]he purpose of the ACD program is to assist FHA to maximize the recovery on assets sold by HUD."  71 Fed. Reg. at 22,743.

35.     In June 2006, HUD published an "Accelerated Claim and Asset Disposition (ACD) Program; Advance Notice of Proposed Rulemaking" in the Federal Register (the "June 2006 Proposed Rulemaking").  71 Fed. Reg. 32,392 (June 5, 2006).

36.     The June 2006 Proposed Rulemaking sought "comments on HUD's Accelerated Claim and Asset Disposition (ACD) program before HUD proceeds to issue a proposed rule that will commence the rulemaking process that will result in codification of the requirements for the ACD program, thus making the ACD program a permanent part of HUD's single family mortgage insurance programs."  71 Fed. Reg. at 32,392.

37.     According to the June 2006 Proposed Rulemaking, "[t]he purpose of the ACD program is to help FHA maximize the recovery on assets sold by HUD."  71 Fed. Reg. at 32,392.

38.     The June 2006 Proposed Rulemaking sought "comments on the ACD Demonstration program, including recommendations of cost-effective, efficient improvements and alternatives that should be made part of the permanent program."  71 Fed. Reg. at 32,392.

39.     The June 2006 Proposed Rulemaking stated that:

Before implementing the new ACD disposition process on a nationwide basis, HUD has conducted an ACD Demonstration program involving a group of defaulted mortgages.  This has allowed HUD to assess the overall effectiveness of this disposition process.  HUD believes that improvements can be made to the program to make it more effective. Consequently, before proceeding with the regulatory codification of the ACD program, HUD is soliciting comments from all interested parties . . . on possible improvements to the program.

        . . .

This notice solicits comments on HUD ACD Demonstration program before HUD issues a proposed rule to codify the requirements for the ACD program.  When codified, the ACD program will become a permanent part of HUD's single family mortgage insurance programs.

71 Fed. Reg. at 32,392.

40.     The June 2006 Proposed Rulemaking further stated that:

Also upon codification, the current regulations in 24 CFR part 203 governing the assignment of mortgages to HUD and related claim procedures will be amended to reflect the new requirements for assignments made pursuant to the ACD program. The proposed rule would also revise 24 CFR part 291, which governs the disposition of HUD-acquired single family property, to incorporate the policies and procedures for the sale of loans assigned to HUD under the ACD program.

71 Fed. Reg. at 32,392.

41.     The June 2006 Proposed Rulemaking stated that "[a]n objective of the ACD Program will be to maximize the return to the FHA insurance fund." 71 Fed. Reg. at 32,392.

42.     The June 2006 Proposed Rulemaking stated that "[p]ublic comments received in response to this notice will be used to develop a proposed rule that will commence the rulemaking process to codify the ACD program." 71 Fed. Reg. at 32,393.

43.     In September 2006, HUD reopened the comment period from the June 2006 Proposed Rulemaking. 71 Fed. Reg. 54,451.

44.     In March 2007, the proposed rulemaking was withdrawn. *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=200704&RIN=2502-AI14 (last visited Mar. 10, 2020).

45.     HUD did not amend the regulations at 24 C.F.R. part 203 and 24 C.F.R. part 291 to reflect the impacts or changes as a result of the ACD program.

46.     HUD conducted six ACD sales, known during that time period as SFLS, between 2010 and mid-2012, despite the fact that HUD never conducted notice and comment rulemaking governing the ACD program following the withdrawal of the proposed rulemaking in March 2007.

### *HUD's Distressed Asset Stabilization Program*

47.     In mid-2012, HUD reorganized ACD/SFLS into the Distressed Asset Stabilization Program ("DASP").

48.     HUD did not conduct any rulemaking or publish any information with respect to DASP in the Federal Register.

49.     In an explanation of DASP, HUD identifies the sale of "Standard, National Pools" of notes as a "new program."  Ex. 2.

50.     Between September 2012 and the present, HUD has conducted eight bulk note sales under the DASP program, though HUD still referred to these sales by the name SFLS.

51.     The bulk note sales between 2010 and the present have accounted for almost 109,000 loans with unpaid principal balances totaling $18.4 billion.

52.     DASP has come under scrutiny and criticism due to having adverse, unintended effects on communities containing properties subject to the bulk note sales.  *See, e.g., Vulture Capital Hits Home – How HUD is Helping Wall Street and Hurting Our Communities*, The Center for Popular Democracy, Sept. 2014, available at: http://homesforall.org/wp-content/uploads/2014/09/HUD.DASP_.RTC_.v15.pdf (last visited Mar. 10, 2020).

53.     If ACD/SFLS/DASP had been subject to notice and comment rulemaking, commenters could have addressed or warned HUD about the potential adverse effects or unintended consequences of its program, and HUD could have tailored a final rule to respond to any such issues.

54.     Further, if ACD/SFLS/DASP had been subject to notice and comment rulemaking, AMB and other class members could have submitted comments to HUD to ensure that loans subject to indemnification agreements were not included in the program and to ensure that the program did not conflict with HUD's obligations under its indemnification agreements.

55.     In July 2017, the HUD Office of Inspector General ("HUD OIG") released a report finding that HUD was required to conduct notice and comment rulemaking to implement the SFLS/DASP program, but had failed to do so.  Ex. 3.

56.     HUD was provided with an advance copy of the July 2017 HUD OIG Report and was allowed to respond to HUD OIG's assertions and recommendations.

57.     While HUD claimed in its response letter that the bulk note sales were "guided by a series of well documented procedures used both internally by staff and externally by stakeholders," HUD did not dispute HUD OIG's allegations that HUD had failed to conduct the requisite notice and comment rulemaking in connection with the ACD/SFLS/DASP program.  Ex. 3, at 10-11.

58.     HUD instead stated in its response letter that "[w]e concur with the recommendations" made by HUD OIG, which included a recommendation that HUD "[c]omplete the rulemaking process for HUD's single-family note sales program."  Ex. 3, at 7, 11.

59.     On May 6, 2019, HUD published an Advance Notice of Proposed Rulemaking seeking comments on the SFLS Program.  84 Fed. Reg. 19,748.  While comments were due by July 5, 2019, HUD has yet to take any further action on rulemaking with respect to the SFLS program.

### *ACD/SFLS/DASP Is Contrary to HUD's Regulations Governing Note Sales*

60.     Payment of insurance claims, assignment of collateral to HUD in exchange for payment of insurance claims, and mortgage servicing for such properties are generally covered by HUD's regulations at 24 C.F.R. § 203, Subparts B & C.

61.     HUD's disposition of mortgage notes it receives in exchange for paying insurance claims are generally governed by HUD's regulations at 24 C.F.R. § 291, Subpart D.

62.     The ACD demonstration program, which applied to note sales between 2002 and 2005, was subject to notice and comment rulemaking procedures, and could therefore operate outside of the normally-applicable HUD regulations for payment of insurance claims, assignment of collateral to HUD in exchange for payment of insurance claims, mortgage servicing for such properties, and disposition by HUD of mortgage notes it receives in exchange for paying insurance claims.

63.     Subsequent ACD/SFLS/DASP sales starting in 2010 which were not part of the ACD demonstration program were not subject to notice and comment procedures.  *See* http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/comp/asset/sfam/sfls     (last visited Mar. 10, 2020) (copy attached as Ex. 4) (HUD separately lists the sales prior to 2010 under the heading "Sales under the ACD Demonstration").

64.     ACD/SFLS/DASP sales which were not part of the ACD demonstration program could not legally operate outside of the requirements of HUD's regulations.

65.     The original demonstration project was for purchasers to enter into a joint venture with HUD such that HUD retained interest in the loans.  John Lucey, Director of HUD's Office of Asset Sales testified that, unlike the original demonstration project, the SFLS does not have any "joint venture" structure.

66.     The procedures and requirements of the ACD/SFLS/DASP note sales do not comport with the applicable requirements of 24 C.F.R. § 203, Subparts B & C and 24 C.F.R. § 291, Subpart D.

67.     For example, when a mortgage defaults, the mortgagee normally must first recover the collateral (*e.g.*, foreclosure, obtain a deed in lieu of foreclosure) or change the status of the

mortgage (*e.g.*, forbearance, modification, refinance, assumption) before making a claim. 24 C.F.R. § 203.355. ACD/SFLS/DASP negates this regulation.

68. As another example, HUD normally may only accept assignment of a mortgage note (as opposed to conveyance of the property) in limited, specified circumstances. 24 C.F.R. § 203.355. ACD/SFLS/DASP negates this regulation.

69. As another example, the requirements HUD places on buyers and servicers after the bulk note sale are inconsistent with and more onerous than the requirements provided for under HUD's regulations. 24 C.F.R. § 291.307.

### *Executive Order No. 13892*

70. On October 9, 2019, the President issued Executive Order No. 13892: "Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication." 84 Fed. Reg. 55239 (Oct. 15, 2019).

71. The Executive Order states that "[t]he rule of law requires transparency," and that the APA was enacted "to avoid the inherent arbitrary nature of unpublished ad hoc determinations." *Id.*

72. The Executive Order states that "[u]nfortunately, departments and agencies (agencies) in the executive branch have not always complied with these requirements. In addition, some agency practices with respect to enforcement actions and adjudications undermine the APA's goals of promoting accountability and ensuring fairness." *Id.*

73. Pursuant to the Executive Order, "[w]hen an agency takes an administrative enforcement action, engages in adjudication, or otherwise makes a determination that has legal consequence for a person, it may apply only standards of conduct that have been publicly stated in a manner that would not cause unfair surprise." HUD violated the Executive Order by failing to

conduct proper notice and comment rulemaking regarding the SFLS program and failing to advise

AMB and the public that loans with indemnification agreements would be included in the SFLS.

### *AMB's Indemnification Agreement with HUD*

74.     On December 10, 2012, AMB entered into an indemnification agreement with

HUD in connection with a HUD audit of an individual mortgage loan originated by AMB, FHA

Case No. 374-5838647 (the "Loan").  A copy of the Indemnification Agreement is attached as

Exhibit 5.

75.     Among other things, the Indemnification Agreement states:

> ***All HUD requirements for servicing and payment of mortgage insurance
> premiums will be observed with respect to such mortgages***.  In the event of a ***valid***
> claim for insurance on any of the mortgages covered by this Agreement,
> indemnification will be in accordance with paragraph (b), (c), (d), or (e), whichever
> applies.  HUD's Investment includes, but is not limited to: the full amount of the
> insurance claim actually paid, . . . ***prorated losses from and expenses associated
> with the sale of a note***, . . . and any other expenses HUD may incur in connection
> with its claim disposition programs regarding FHA insured mortgages. To the
> extent HUD recoups any losses (e.g. receipts for the sale of the property) or ***there
> is any discount on the property*** (e.g., an Officer Next Door discount), HUD will
> deduct the amount of the recoupment or discount from HUD's Investment.
>
> . . .
>
> [Paragraph (c)] Where a HUD/FHA insurance claim has been paid in full and ***the
> property*** has been sold by HUD to a third party, the amount of indemnification is
> HUD's investment as defined in paragraph (a), minus the sales price of ***the property***
> to be paid in accordance with the terms of an invoice or bill the Department sends
> to the mortgagee. . . .
>
> [Paragraph (d)] In any other case where a HUD/FHA insurance claim ***is pending
> or has been paid***, the mortgagee shall pay HUD the amount of HUD's Investment
> in accordance with the terms of an invoice or bill the Department sends to the
> mortgagee.

Ex. 5, at 1 (emphasis added).

76.     Attached to the Indemnification Agreement was a list of "Mortgages Covered By

This Indemnification Agreement," which included the Loan.  Ex. 5, at 2.

77.     The attachment page also had a second section stating: "Of the mortgages covered by this indemnification agreement, the Department is aware that the following mortgages have a ***claim pending***," and also listed the "Known Claim Amount."  Ex. 5, at 2 (emphasis added).

78.     The Loan was not identified as having a "claim pending" when the Indemnification Agreement was signed in 2012.  Ex. 5, at 2.

### *Sale of the Note Underlying the Loan*

79.     Loans which are subject to indemnification agreements are not supposed to be sold as part of the SFLS bulk note sales.

80.     The SFLS Program was designed to, among other things, reduce HUD's timelines for carrying costs of properties and limit HUD's losses.

81.     Here, because HUD had an indemnification agreement from AMB on the Loan, HUD was not at a risk of loss on the Loan because of any delayed or extended timelines.

82.     The Participating Servicer Desk Guide ("Desk Guide") – a document specifically identified by Susan Betts, the HUD Deputy Assistant Secretary for Finance and Budget, as one of the "well documented procedures used both internally by staff and externally by stakeholders" – did not allow for the sale of loans with Indemnification Agreements to be included in bulk note sales.  A copy of the SFLS Participating Servicer Desk Guide for SFLS 2013-2 is attached hereto as Ex. 6.

83.     The Desk Guide "discusses all phases of the SFLS Program, including the processes and timeframes applicable to the various phases of the SFLS Claim Identification process for eligible Mortgage Loans through the reporting requirements."  Ex. 6 at 1-1.

84.     The Desk Guide states that one of the eligibility criteria for the FHA SFLS Program is that the "Mortgage Loan is not subject to an Indemnification Agreement."  Ex. 6 at 2-2.

85.     The Desk Guide states that "Mortgage Loans for which HUD has Indemnification Agreements identified in its system of records will not be issued a SFLS Claim Identification Date." Ex. 6 at 3-2.

86.     The Desk Guide states that the servicer may only submit an SFLS Claim if the Mortgage Loan has been given an SFLS Claim Identification Date. Ex. 6 at 5-1.

87.     The Loan as issue here was identified in HUD's system of records as having an indemnification agreement in place prior to the date of the 2013-2 SFLS; accordingly, no SFLS Claim Identification Date should have been issued by HUD, nor should the servicer have filed an SFLS Claim for the Loan.

88.     Unbeknownst to AMB, and contrary to existing HUD regulations as well as HUD's policies and procedures as set forth in the Desk Guide, HUD sold the note that was secured by the collateral for the Loan through the SFLS program.

89.     HUD requires the servicer for a loan subject to an SFLS sale to obtain a broker price opinion for the property underlying the loan in advance of the sale

90.     Prior to the sale, the servicer determined that the value of the property underlying the Loan was $550,000, as of April 21, 2013.

91.     AMB obtained a valuation of the property underlying the Loan on September 13, 2013 which placed its value at $530,100.

92.     At the time of the SFLS sale, the Loan had an unpaid principal balance of less than $475,000.00.

93.     At the time of the SFLS sale, the value of the property underlying the Loan was greater than the unpaid principal balance, such that a sale of the property at the value as determined in the broker price opinion would have covered the defaulted loan balance.

17

94.     The specific bulk sale which contained the Loan was known as Pool 105 of SFLS 2013-2.

95.     Pool 105 contained 2,278 notes.

96.     The total broker price opinion for all properties whose notes were sold in Pool 105 was $271,330,088.00.

97.     The total unpaid principal balance for all loans in Pool 105 was $337,421,021.43.

98.     On average, the values of the properties in Pool 105 were less than the unpaid principal balances of the note underlying the properties, such that on average sales of the properties would not have covered the defaulted loan balance.

99.     Because the property underlying the Loan was worth more than the unpaid principal on the Loan, it was worth significantly more as compared, on average, to the other notes in Pool 105, where the properties were worth less than the unpaid principal.

100.    The successful bidder for Pool 105 is identified as "SRMOF II 2012-1 Trust."

101.    HUD requires bidders to submit bids expressed as a percentage of the unpaid principal balance to be paid for each mortgage loan.

102.    According to HUD, the purported sales price for a particular note is the result of multiplying the unpaid principal balance for that loan by the bid percentage.

103.    Pool 105 was sold to the highest bidder for the entire pool, which in the case of the Loan resulted in a sales price of $360,531.24 or approximately 66% of the property's value.

104.    Since the note for the Loan was sold to the highest bidder for the entire pool, it was not necessarily sold to highest bidder for that note.

105.    The property underlying the loan was occupied by a renter around the time of the sale, such that inclusion of the Loan in the SFLS program did not fulfill DASP's stated purpose of keeping borrowers in their homes.  Ex. 1

### *The Note Was Not Sold at Market Value or to Maximize Value*

106.    Notes sold as part of SFLS bulk sales are subject to conditions and restrictions which are not normally present in open-market sales.

107.     As HUD explains on its website, "[t]he loans sold contain specified representations and warranties and may be sold with post-sale restrictions and/or reporting requirements."  *See* http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/comp/asset/sfam/sfls    (last visited Mar. 10, 2020).

108.    Bidders for SFLS 2013-2 (which included the note underlying the Loan) were required, among other provisions, to:

    a.    Be a company, trust, or other type of business entity with a net worth of at least $5,000,000;

    b.    Be in the business of buying, originating, or selling mortgage loans or similar assets in the ordinary course of business; and

    c.    Be able to bear the risk of a complete loss of the economic value of the notes they purchases as part of the bulk sale.

Ex. 7, at 3-4 (SFLS 2013-2 Qualification Statement).

109.    HUD maintained the right to, "in its sole discretion, refuse to qualify any prospective bidder who, in FHA/HUD's sole judgment, does not have the requisite knowledge and experience to evaluate the merits and risks of purchasing and to make an informed decision with respect to the purchase of the Mortgage Loans."  Ex. 7, at 7.

110.    Further, the bidder for a pool had to be able and willing to purchase a large number of assets (*e.g.*, thousands of mortgage notes), and purchasers interested in an individual property, such as the property that is the collateral for the Loan, were excluded from bidding.

111.    The program imposes post-sale restrictions on the property, which include allowing the original borrower to remain in residence for at least six months or one year (depending on when the sale occurred) while evaluating a second round of loss mitigation options.

112.    Borrowers whose loans were subject to the bulk sale had already failed to avoid default during an initial rounds of loss mitigation procedures which was mandated by statute and regulation.

113.    All mortgage loans purchased through the bulk sales must be serviced by a HUD-approved mortgage servicer for the remaining life of the mortgage loan, and a purchaser that is not a HUD-approved mortgage servicer must retain a HUD-approved mortgage servicer to service the mortgage loans.

114.    The restrictions on who could bid, and the post-purchase restrictions on what could be done with the properties, resulted in a reduction in the sales price compared to what HUD could have obtained if it had sold the collateral on the open market or had sought to maximize value.

115.    The ALJ arbitrarily and capriciously ignored all of AMB's arguments and stated that AMB presented "no evidence as to what sort of return a seller can expect when it sells a defaulted note individually." Decision at 9. Moreover, the ALJ's reasoning defies common sense, the note was not supposed to be sold because of the indemnification agreement and the return a seller can expect from the sale of the collateral is the fair market value of the collateral–$550,000–as determined by the BPO obtained by the servicer prior to the note sale.

*Mortgage Servicing and Insurance Claims for SFLS Mortgages*

116.    To become a HUD-approved mortgage servicer for SFLS loans, the servicer must enter into a Participating Servicer Agreement ("PSA") with HUD.

117.    JPMorgan Chase Bank, N.A. ("JPMorgan") entered into a PSA with HUD in connection with SFLS 2013-2, the sale which covered the note securing the Loan.  Ex. 8 (PSA between HUD and JPMorgan for SFLS 2013-2).

118.    Under the PSA, HUD only needs to pay an insurance claim for an "Eligible Mortgage Loan." Ex. 8 at 9.

119.    "Eligible Mortgage Loan" is defined, in relevant part, as "a single-family mortgage loan which meets all of the following requirements as of the date of SFLS Claim Submission Report-A (unless explicitly excepted), and continues to meet all such requirements as of the Claim Submission Date: . . . (h) the Mortgage Loan is not subject to an Indemnification Agreement." Ex. 8, at 9.

120.    With respect to "Filing and Payment of Insurance Claims," the PSA provides:

The Participating Servicer shall review its entire portfolio of FHA insured loans and, for each ***Eligible Mortgage Loan*** that the Participating Servicer intends to submit as an Insurance Claim, obtain a [risk score] prior to the submission of the initial SFLS claim submission report ("SFLS Claim Submission Report-A"). [Then] Participating Servicer shall submit SFLS Claim Submission Report-A to HUD with a list of ***Eligible Mortgage Loans*** it intends to submit as Insurance Claims.  All of the information required for the SFLS Claim Submission Report, including the submission procedures and the data format for the list of ***Eligible Mortgage Loans*** submitted and the Participating Servicer Program Eligibility Certification is set forth in Appendix 3 to the Desk Guide.

Ex. 8 § 2.01 (emphasis added).

121.   Next:

[A]fter Participating Servicer's submission of the SFLS Claim Submission Report pursuant to Section 2.01, the list of ***Eligible Mortgage Loans*** shall be updated on FHA's claim processing system ("FHA System") to allow for claim payment, and HUD will advise Participating Servicer of those ***Eligible Mortgage Loans***

designated in the FHA System with an SFLS Claim Identification Date by electronic transmittal of an SFLS claim identification report ("SFLS Claim Identification Report") to Participating Servicer. HUD's identification process will be used only to identify mortgage loans submitted as potential SFLS Claims by Participating Servicers and not to screen mortgage loans for eligibility, *with the exception of mortgage loans subject to an Indemnification Agreement*. Without limiting Participating Servicer's obligations in Section 4.0l(b), *HUD will not issue an SFLS Claim Identification Date for any mortgage loans for which Indemnification Agreements are identified on HUD's system of records*.

For *Eligible Mortgage Loans* that received a SFLS Claim Identification Date, the cut-off date for submission of a claim is no later than August 30, 2013. In the event, after an SFLS Claim Identification Date is issued, a mortgage loan *is not or has failed to continue to be an Eligible Mortgage Loan, Participating Servicer shall not submit a claim on such mortgage loan*.

Ex. 8 § 2.02 (emphasis added).

122.    Finally, "[a]n Insurance Claim may be submitted by Participating Servicer for any *Eligible Mortgage Loan* provided that the Participating Servicer has received an SFLS Claim Identification Date prior to submission of an SFLS Claim with respect thereto." Ex. 8 § 2.03 (emphasis added).

### *No Valid Insurance Claim on the Loan*

123.    HUD tracks information about FHA-insured loans in a software program known as Neighborhood Watch.

124.    Both HUD and JPMorgan had access to information about the Loan in Neighborhood Watch.

125.    Since the Indemnification Agreement between HUD and AMB was signed in December 2012, the Loan was not an "Eligible Mortgage Loan" for purposes of making an insurance claim under the PSA by 2013.

126.    JPMorgan made an insurance claim on the Loan on August 6, 2013, for $520,979.86.

127.    The Loan was identified in Neighborhood Watch as being subject to an Indemnification Agreement.  Ex. 9, at 3.

128.    Both HUD and JPMorgan failed to screen out the Loan as ineligible for an insurance claim due to the presence of the Indemnification Agreement, despite the clear obligation on the part of both parties to do so.

129.    HUD paid the insurance claim of $520,979.86 to JPMorgan on August 10, 2013.

130.    Since JPMorgan was barred from making the insurance claim due to the Loan not being an "Eligible Mortgage Loan," the claim for insurance was not valid.

131.    John W. Lucey, Director of HUD's Asset Sales Office, testified that JP Morgan should *not* have filed a claim for insurance for the Loan and he confirmed that the note for the Loan should *not* have been included in the SFLS.

132.    HUD acted in an arbitrary and capricious manner in paying the non-valid claim for insurance.

133.    The Indemnification Agreement required that "[a]ll HUD requirements for servicing . . . will be observed with respect to" the Loan.

134.    The prohibition on making an insurance claim for indemnified loans was a requirement for servicing with respect to the Loan.

135.    The Indemnification Agreement only requires AMB to identify HUD for losses paid on a "valid insurance claim," Ex. 5, at 1, such that AMB is not required to indemnify HUD in connection with the Loan.

### *HUD Sold the Note at a Discount*

136.    HUD has regularly stated that notes sold as part of the SFLS bulk sales were sold at a discount.

137.    For example, in a report on the bulk note sale program, HUD repeatedly stated that it sold the notes that were part of the program "at a discounted price" and at a "discount." Ex. 10, at ii, iii, 1, 3, 11, 18.

138.    As another example, in a different report, HUD OIG stated that HUD "sells the note to a joint venture at a discounted price." Ex. 11, at 5.

139.    As another example, a HUD press release announcing DASP stated that "[t]he investor purchases the loan at a discount." Ex. 12, at 1.

140.    The property underlying the Loan had a value of $550,000 pursuant to a valuation HUD required the mortgage servicer to obtain on the property as a precondition to including it in the bulk note sale.

141.    HUD sold the note for $360,531.24 or approximately 66% of the property's value.

142.    Under the Indemnification Agreement, "[t]o the extent HUD recoups any losses (e.g. receipts for the sale of the property) or there is any discount on the property (e.g., an Officer Next Door discount), HUD will deduct the amount of the recoupment or discount from HUD's Investment."

143.    The term "*e.g.*" is an abbreviation for the Latin phrase "*exempli gratia*," which means "for the sake of example" or "for example," and is used to introduce representative, non-exclusive examples of something.

144.    While the Indemnifications Agreement states that the Officer Next Door program is one example of a "discount," that does not mean that it is the only type of program treated as a discount under the Indemnification Agreement.

145.    In order to save HUD from its own admissions, the ALJ adopts the post-hoc rationalization of a HUD witness who characterized HUD's numerous and repeated references to

a "discount" in connection with the bulk note sale program simply as "bad writing."  Decision at 9.

146.     The ALJ goes further and posits that to qualify as a discount, the reduction must be at "a predetermined or set amount."  Decision at 9.  The ALJ provides no justification for this assertion or newfound definition, which is in direct contravention of the plain language of the Indemnification Agreement which provides that HUD will "deduct the amount" of "any discount" on the sale of the property.

147.     HUD acted in an arbitrary and capricious manner when it did not deduct the amount of the discount resulting from the bulk note sale from what it claims AMB owes under the Indemnification Agreement.

### *The Indemnification Agreement Required HUD to Sell the Property Instead of the Note*

148.     An indemnitee, like HUD, is obligated to reasonably mitigate its damages, and an indemnitor, like AMB, is not responsible to pay for damages which could have been mitigated.

149.     The Indemnification Agreement discussed several scenarios of how HUD could liquidate the collateral it received for paying the insurance claim in order to recoup its loss.

150.     Under the circumstances of this case, HUD was obligated to sell the property underlying the Loan instead of just the note in a bulk note sale which was not permitted under existing HUD regulations.

151.     A provision of the contract which could have allowed HUD to sell just the note was inapplicable since it only applied to insurance claims which were pending or paid at the time the parties entered into the Indemnification Agreement, which was not the case here.

152.   Alternatively, to the extent HUD was allowed to sell the note in a bulk sale – which it was not – HUD was required to "prorate[] losses from and expenses associated with the sale of the note." Ex. 5, at 1.

153.   HUD did not prorate its losses on the sale of the note notwithstanding the fact that it sold the note at an admitted discount.

### *HUD Seeks Indemnification from AMB*

154.   HUD did not seek to collect under the Indemnification Agreement with AMB after it paid the claim in August 2013.

155.   During or before mid-July 2014, the HUD OIG informed HUD that HUD OIG believed HUD had failed to collect under indemnification agreements related to loans which were sold as part of the SFLS program and for which an insurance claim was made. Ex. 11.

156.   The HUD OIG Report did not discuss the fact that loans which were subject to indemnification agreements were not supposed to be part of the SFLS program, or that HUD was not supposed to pay insurance claims for indemnified loans subject to the SFLS program.

157.   HUD informed HUD OIG on July 24, 2014, that it would begin trying to collect alleged losses for indemnified loans which were sold as part of the SFLS program. Ex. 11, at 20.

158.   HUD did not inform HUD OIG that it was HUD's responsibility to screen the pools of loans to remove those loans with indemnification agreements from the pool.

159.   HUD also did not inform HUD OIG that HUD was not required to pay insurance claims on such loans.

160.   On July 28, 2014, as a result of the HUD OIG's prompting, HUD sent AMB a Demand Notice for $160,448.62, the difference between what HUD paid for the insurance claim and what it received from the note sale for the Loan.

161.    AMB sought more information from HUD regarding the note sale in connection with the Loan and why a loan subject to an indemnification agreement had been included in the SFLS sale, notwithstanding HUD's policy that such loans should not be included.

162.    On October 13, 2014, HUD issued a Notice of Intent to Collect by Treasury Offset for the alleged amount owed of $161,897.31 (the amount owed had accrued alleged interest).

163.    In a December 2014 letter between HUD and AMB regarding the alleged amount owed, HUD admitted that it "acknowledges that the indemnified loan was erroneously included in the Single Family Loan Sale (SFLS) Program," but still demanded payment.  Ex. 13.

164.    In the December 2014 letter, HUD claimed that inclusion of the Loan in the SFLS program "did not impact on the legal enforceability of the Indemnification Agreement," but did not proffer any basis for the assertion, nor attempt to explain why HUD used a sales process which recovered only 66% of the value of the underlying property for an intentional loss.  Ex. 13.

### *HUD Attempts to Collect by Administrative Offset*

165.    Treasury offset, also known as administrative offset, is a procedure in which the Government recoups money it is allegedly owed by withholding money which belongs to the alleged debtor that is in the Government's possession or which the Government is otherwise obligated to pay to the alleged debtor.  31 U.S.C. § 3716.

166.    When HUD seeks to collect a debt through administrative offset, it must provide "an opportunity for a review within the agency of the decision of the agency related to the claim." 31 U.S.C. § 3716(a)(3).

167.    Under HUD regulations, an alleged debtor "who receives notice of intent to offset . . . has the right to a review of the case and to present evidence that all or part of the debt is not past due or not legally enforceable."  24 C.F.R. § 17.69(a).

168.     The administrative proceeding is presided over by a HUD Administrative Judge ("AJ").

169.     "The decision of an administrative judge of the [HUD Office of Appeals] will be based on a preponderance of the evidence as to whether there is a debt that is past due and whether it is legally enforceable."  24 C.F.R. § 17.69(c).

170.     "The decision of the administrative judge of the [HUD Office of Appeals] concerning whether a debt or part of a debt is past due and legally enforceable is the final agency decision with respect to the past due status and enforceability of the debt."  24 C.F.R. § 17.73(a).

171.     In normal situations where one entity alleges that another entity owes it money, the alleged creditor is generally required to file a court case and obtain a judicial judgment that the alleged debtor owes the money.

172.     The alleged creditor can then collect the money owed through the court's judgment.

173.     With administrative offset, HUD is able to short-circuit the normal requirement of going to court and obtaining a court judgment before it can begin collecting money which it is allegedly owed.

### *Administrative Proceedings Before HUD*

174.     On December 17, 2014, AMB filed a timely agency appeal with HUD's Office of Hearings and Appeals of HUD's decision to seek administrative offset.

175.     On December 17, 2014, the AJ assigned to the case issued a stay of the administrative offset pending a final decision on AMB's appeal.

176.     After an administrative process that lasted two years, the HUD AJ issued her Decision and Order on December 16, 2016.

177.    The HUD AJ found the debt to be legally enforceable against AMB and vacated the prior stay of HUD's collection by administrative offset.

178.    AMB appealed the AJ's Decision to the United States District Court for the District of Columbia, Case No. 17-00075-ESH

179.    Ultimately, this Court vacated the AJ's December 16, 2016 decision, ruling that pursuant to the Supreme Court's decision in *Lucia v. S.E.C*, 138 S. Ct. 2044 (2018), the HUD AJ who had issued the decision was not properly appointed.  Mem. Op. No. 17-0075-ESH, 2019 U.S. Dist. LEXIS 1603 (Jan. 4, 2019, D.D.C.).

180.    In response to the remand order, the HUD Chief ALJ issued a Memorandum dated February 20, 2019, wherein he declared that the AJ who previously ruled in this matter was a properly appointed judge with "outstanding qualifications" that warranted reinstatement of her prior opinion.

181.    Based on the statements by the Chief Administrative Law Judge, AMB filed a motion seeking the Court to direct the remand to a constitutionally-appointed official who is not under the direction, supervision, or control of HUD's Chief ALJ.  *See* AMB's Rule 60 Motion (Dkt. No. 53).

182.    The District Court denied AMB's motion and the matter was assigned to a different HUD ALJ under the direction, supervision, and control of HUD's Chief ALJ.

183.    AMB filed a motion seeking a hearing on HUD's offset claim, but that motion was rejected by the ALJ, who found that there were no credibility issues presented by the matter.  In spite of this ruling, however, the ALJ took it upon himself to make credibility determinations based solely upon the written submissions of the parties.

184.     The ALJ made purported factual findings that are not supported by the record, including, for example, that "Petitioner executed the Indemnification Agreement in consideration for HUD's agreement to forbear from referring Petitioner to the MRB, thereby allowing Petitioner to retain its status as an FHA-approved mortgagee."  Decision at 7.  There is nothing in the Indemnification Agreement, or anywhere else in the record to support the assertion that AMB's execution of the Indemnification Agreement was "consideration" for allowing it to "retain its status as an FHA-approved mortgagee."  When HUD alleged an underwriting issue associated with the Loan, AMB had many options to address the allegation.  AMB could have chosen to fight HUD's allegations and had the matter presented to the Mortgagee Review Board ("MRB").  The MRB could have dismissed the matter or issued one of its limited sanctions, such as a letter of reprimand, probation, civil money penalty capped at $7,500, suspension, or one year withdrawal.  24 C.F.R. §§ 25.5, 30.35.  The point is, however, is that there is nothing in the record to support the ALJ's erroneous factual assertion that the consideration AMB received was to remain as an FHA-approved mortgagee.

185.     While purporting to analyze the Indemnification Agreement, the ALJ completely disregarded the plain language of that Agreement.  In particular, the ALJ completely ignored the requirement of a "valid claim," instead rejecting the qualifier of "valid" as "a technicality" thereby rendering the provision superfluous and twisting the plain language of the Indemnification Agreement into a tautological circularity.  Decision at 16 ("But the term 'valid,' as used in the Indemnification Agreement, cannot be synonymous with the PSA's use of the term 'eligible,' because under the PSA, an "Eligible Mortgage Loan," by definition, excludes any loan that is subject to an indemnification agreement.").

30

186.     The ALJ committed a clear error of law in rejecting the well-established legal principle that ambiguity in the Indemnification Agreement – a contract between AMB and HUD – "should be construed most strongly against the drafter, which in this case was the United States." *United States v. Seckinger*, 397 U.S. 203, 210 (1970).  Rather, in the ALJ's opinion, the language and terms at issue "suggest that the 'valid' insurance claim is simply one that was brought about by Petitioner's origination of the Springer loan[.]"  Decision at 16.  The ALJ's interpretation, which he characterizes as "HUD's preferred construction," is contrary to law and completely eviscerates a plain requirement of the Indemnification Agreement.

187.     In permitting the Loan to be part of the 2013-2 SFLS, HUD breached the requirement in the Indemnification Agreement that "[a]ll HUD requirements for servicing and payment of mortgage insurance premiums will be observed."  Ex. 5, at 1.

188.     The ALJ's determination that the contractual requirement that "[a]ll HUD requirements for servicing and payment of mortgage insurance premiums will be observed" could not be material to AMB because AMB could not negotiate the terms of the Agreement is specious. Decision at 15.  The only evidence in the record is the statement from AMB's former president who stated that knowing that the loan would continue to be properly serviced was material to AMB.  Accordingly, the ALJ's decision to permit HUD to simply cast aside a provision of the contract because the ALJ thought it immaterial is arbitrary and capricious.

189.     The ALJ's statement that "[a]s drafter of the Indemnification Agreement, HUD likely intended to bind only the indemnitor," Decision at 14, demonstrates the extent to which the ALJ substituted his bias against AMB since there is no evidence in the record supporting such an "intent" on the part of the Agency.

190.    The ALJ erred in finding that AMB was not "harmed" by the selling of the Note in a bulk sale.  In order to make that finding, the ALJ simply ignored the unrefuted evidence submitted by AMB, including, but not limited to:

a.    The Broker Price Opinion obtained by the servicer with a value of $550,000 at the time of the Note Sale was far closer in time than a later sale price for the property of $450,000, which was more than a year after the Note Sale;

b.    The ALJ found that "the sale price of $450,000 is a better estimate than the [$499,000] mortgage of the actual value of the property as of July 2014," Decision at 11, but the SFLS 2013-2 occurred more than a year earlier, on June 26, 2013;

c.    That notes sold in bulk are necessarily at a discount; *but see* Decision at 10 (The ALJ makes the obvious observation that "[t]he Note was naturally worth less than the property," but then concludes there was no harm to AMB).

191.    The ALJ's reliance on the condition of the property, "a leaky roof and significant deferred maintenance," Decision at 11, was based on hearsay–a 2019 telephone conversation HUD employee Brian Dillion had with a real estate agent who sold the property more than a year after the bulk note sale.  The real estate agent advised Mr. Dillion during the telephone call that he was "unable to recall the details about this specific purchase," yet the ALJ found this hearsay evidence more credible than the BPO HUD directed the servicer to obtain for use in bulk note sale.

192.    Mr. Dillion admitted that he had no personal knowledge of the condition of the property at any time.

193.    The ALJ made findings based on "likely" assertions, such as that "July 2014, the date the borrower sold the property herself, is likely closer to the date HUD would have been able to sell it after completing the lengthy foreclosure process."  Decision at 11.

194.    The ALJ manufactured facts out of whole cloth in order to justify his erroneous conclusions.  For example, the ALJ found that "[i]n this case, the fact that the Note sold for less than the unpaid principal balance indicates that the originator, Petitioner, overvalued the mortgage."  Decision at 9.  But there is nothing in the record to support the assertion that the original appraisal on the property was inflated.  Furthermore, this erroneous statement is inconsistent with the ALJ's later statement that "[t]he Note was naturally worth less than the property," which the ALJ asserts is caused by the fact that the loan was in default.  *Id.* at 10.

195.    The ALJ manufactured purported "facts" without any support in evidentiary record. For example, the ALJ concluded that "HUD was unable to recover the full amount of the unpaid balance [AMB] originated a bad loan, and buyers deemed its actual value to be less than the unpaid balance reflected on the face of the Note."  Decision at 9.  But there was no testimony to support the ALJ's assertion that the price paid for the note had anything to do with the origination of the loan, nor was there any testimony from any "buyers."  In short, the ALJ simply made up these purported "facts" to support his erroneous conclusions.

196.    The ALJ's rejection of the BPO obtained by the servicer prior to the note sale, as simply a "ballpark estimate," is clearly erroneous.  HUD relies on the BPO values provided by the servicers to conduct its note sales, yet, in this litigation it claims that such valuations are meaningless.

197.    The ALJ's bias against AMB is demonstrated by his reliance on the testimony of Brian Dillion that "the sale of a foreclosed property is likely to net approximately 15 to 20% less than its full value."  Decision at 11.  The ALJ misquoted the undisputed evidence, which is that Mr. Dillion was relying on an article which he clearly had not even read, "Estimating the House Foreclosure Discount Corrected for Spatial Price Interdependence and Endogeneity of Marketing

Time," to support his assertion in his declaration that "the real estate market discounts foreclosed property between 15 and 20 percent of its market value." The authors of the study actually concluded that the "discount" is about 10%, and when controlling for other factors such as property condition, occupancy and cash transaction, the "foreclosure discount" is reduced to 7.5%.

198.    In his deposition, Mr. Dillon specifically repudiated the statement that foreclosed loans net 15-20% less and, in fact, testified that any assertion of the value of the property was "speculation, not factual" on his part. The ALJ mistakenly attributes the term "speculative" to AMB rather than as the words of HUD's own witness, Decision at 11, and then goes on to ignore AMB's evidence demonstrating that the value of the property was worth far more than the $360,531.24 that HUD received by selling the Note in the bulk sale.

199.    Similarly, the ALJ's citation to a declaration from Patricia Moroz, "a HUD economist from the northeastern United States" is equally demonstrative of the ALJ's bias. AMB objected to the submission of this declaration because AMB never had the opportunity to respond to it. The ALJ, as expected, overruled AMB's objection and admitted the evidence. The ALJ's assertion that he followed the requirements of 24 C.F.R. § 26.24 by permitting the parties "to conduct such cross-examination and submit rebuttal evidence as may be required for a full and true disclosure of the facts," rings hollow.

200.    And, in any event, the ALJ simply accepted Ms. Moroz's statements despite the fact that while Ms. Moroz stated that she used "commercially available data that HUD purchases from CoreLogic, Inc.," the data was not publically available to AMB, as highlighted by the fact that HUD had to "purchase[d]" it. Further, Ms. Moroz did not attach the data she allegedly utilized to her Declaration so there is no way to verify any of the assertions regarding the purported "discount" between "average resale price for an existing home" and the "average REO sale price"

in the various locations.  Likewise, since AMB cannot perform its own review of all the data, it is unclear whether Ms. Moroz's review may have omitted data which favored AMB.  Despite AMB's timely objections, the ALJ did not require HUD to produce the data and admitted Ms. Moroz's declaration and relied upon it to render his decision.

201.     Further, when HUD's witnesses could not provide certain evidence, such as Mr. Lucey's inability to identify "any public documents comparing note sale recoveries and property recoveries for SFLS 2013-2," the ALJ came to the rescue and identified what he believed were relevant documents.  Decision at 10, n.10.

202.     Incredibly, the ALJ states that "HUD is accountable to Congress for its stewardship of the Mutual Mortgage Insurance Fund, a responsibility the agency appears to take seriously.  The Court will not assume, without evidence, that HUD is disposing of its distressed mortgage assets in a careless or fiscally irresponsible manner."  Decision at 10.  Yet, the ALJ simply ignores the undisputed fact that HUD violated its own program for disposing of its distressed mortgage assets through bulk note sales.

203.     The ALJ relies on the SFLS program to justify its use in disposing of distressed assets yet he completely ignores the fact that the SFLS program *did not permit the sale of notes where there were Indemnification Agreements* such as the AMB Loan at issue here.

204.     HUD's decision to prohibit the sale of notes for loans where there are indemnification agreements in place reflects the fact that it is unnecessary and, indeed, counterproductive, to sell such notes because the existence of the indemnification agreement for a loan ensures that the Mutual Mortgage Insurance Fund will be reimbursed in full for any losses that are incurred.

205.     On February 28, 2020, the ALJ issued his decision rejecting in full all of AMB's arguments and finding that the alleged debt is past due and legally enforceable, and vacated the prior stay of HUD's collection by administrative offset.  Decision at 19.

206.     The HUD ALJ's Decision that the debt was due and enforceable, and that it could be collected by administrative offset, was arbitrary and capricious, contrary to law, and was not based on substantial evidence.

### *Harm to AMB and Class Members*

207.     HUD's failure to properly screen the mortgage loans that the servicer has included in the bulk note sale is inexcusable and resulted in serious damage to AMB and the putative class.

208.     Among other things, by selling the Loan, as well as other loans subject to indemnification agreements, as part of the SFLS program, HUD breached the terms of the indemnification agreements it executed with lenders.

209.     The indemnification agreements contemplate that HUD will exercise reasonable business judgment in liquidating the collateral, which generally requires sale of the collateral that maximizes its value and minimizes HUD's loss.

210.     The indemnification agreements also contemplated that HUD would follow existing regulations, which HUD did not do because the SFLS program was not authorized under HUD regulations.

211.     Pursuant to the terms of the Indemnification Agreement, HUD was required to sell the collateral, *i.e.,* the home, and then seek recovery for its losses, if any remained, from AMB.

212.     Instead, HUD sold the note for the Loan as part of a pool in a process that necessarily reduced the amount of HUD's recovery by excluding potential bidders and placing non-standard restrictions and conditions on the note buyer's handling of the loan after the sale.

213.      HUD's reckless and intentional disregard of its obligations and its own rules caused financial injury to AMB, as well as to other lenders, and the agency's conduct was arbitrary, capricious, and contrary to law.

### CLASS ALLEGATIONS[3]

214.      AMB seeks to represent a class of mortgage lenders (the "Lender Class") who executed indemnification agreements on loans that were improperly included in the ACD program either through the SFLS or some other accelerated disposition program.

215.      HUD's complete failure to properly screen the loans identified by servicers to remove those loans with indemnification agreements was widespread.

216.      On August 8, 2014, HUD OIG issued a Report of its audit of HUD's indemnification recovery process for single-family loans.  HUD OIG determined that there were "243 loans that were part of the ACD program from January 1, 2004, to February 21, 2014, that had indemnification agreements; however, HUD did not evaluate any of these loans for billing." Ex. 11, at 5.  According to the Report, the losses on those loans exceeded $22 million.

217.      The HUD OIG Report specifically identifies the Loan, FHA Case No. 374-5838647, as one of the loans for which HUD had not "billed" the lender because the loan was sold through the ACD program.  Ex. 11, at 29.

---

[3]  In a Memorandum Opinion and Order dated Sept, 20, 2017, this Court (Huvelle, J), dismissed AMB's class action claim *sua sponte* without any notice or briefing by the parties.  AMB believes that class treatment of its APA claim is appropriate, and continues to assert it in order not to waive any of its rights. *See, e.g., Healthy Futures of Tex. v. HHS*, 326 F.R.D. 1, 10-11 (D.D.C. 2018) (certifying a class of entities whose grants were shortened by a decision by HHS, which the plaintiff alleged was arbitrary and capricious); *Steele v. United States*, 159 F. Supp. 3d 73 (D.D.C. 2016), *modified on reconsideration*, 200 F. Supp. 3d 217 (D.D.C. 2016); *Roshandel v. Chertoff*, 554 F. Supp. 2d 1194, 1206 (W.D. Wash. 2008) ("Nothing in section 1447(b), or common sense, precludes resolving Plaintiffs' section 1447(b) or APA claims on a class-wide basis.").

218.     The fact that the HUD OIG conducted the audit and admonished HUD's Office of Finance and Budget for its failure to seek recovery in those situations where HUD sold the loan through an SFLS explains why HUD did not seek recovery from AMB until July 2014 when, in fact, the Agency sold the note in or around September 2013.

219.     HUD's failure to exclude the indemnified loan from the SFLS program, and HUD OIG's lack of knowledge that indemnified loans were supposed to be excluded from the SFLS program, stems in part from HUD's failure to adopt a clear, unified, final rule governing the SFLS program.

220.     In a July 2017 HUD OIG Report, HUD OIG criticized HUD for failing to have or adopt a unified, final regulation setting forth the policies, procedures, and rules with respect to implementation of the SFLS program.  Ex. 3.

221.     The July 2017 HUD OIG Report also found that HUD had failed to use notice and comment rulemaking procedures before adopting policies and procedures governing the SFLS program, a point which HUD did not dispute when given an opportunity to respond to an advance copy of the Report.  Ex. 3, at 10-11.

222.     If HUD had adopted a valid regulation and had a clear, unified set of policies, procedures, and rules with respect to implementation of the SFLS program, HUD and HUD OIG would likely have been aware earlier that loans subject to indemnification agreements were not supposed to be part of the SFLS program.

223.     On information and belief, members of the Lender Class received a Notice of Intent to Collect by Treasury Offset substantially identical in form to the one sent to AMB.

224.     HUD did not alert the Lender Class that HUD breached its own policies and regulations regarding the disposition of the loans.

225.     The Lender Class has no way of uncovering HUD's reckless and/or willful disregard of its own policies unless they individually undertook their own substantial investigation.

226.     The members of the Lender Class have been injured to the same extent as AMB, to wit, the amount of purported debt each class member purportedly owes HUD has been significantly increased because HUD violated its own procedures by including loans in SFLS that were subject to indemnification agreements, and violated its own regulations by selling notes in the ACD/SFLS/DASP bulk sales.

227.     Upon information and belief, some members of the Lender Class have paid the amounts demanded by HUD.

228.     Upon information and belief, payments under the indemnification agreements with HUD are placed in the MMI Fund and are not placed in the U.S. Treasury.

229.     HUD's conduct towards the Lender Class was identical, and each member of the Lender Class was harmed in an identical fashion; thus, this case is amendable to class treatment pursuant to Rule 23, Fed. R. Civ. P.

230.     Pursuant to Rules 23 (a) and 23(b)(1)-(3), AMB seeks certification of the following class:

> All mortgage lenders who executed an indemnification agreement with HUD in connection with one or more loans and where the loans were subsequently included in an SFLS or other ACD Note Sale at any time prior to final judgment in this action.

231.     AMB will adequately represent the interest of the Lender Class.

## COUNT I

### Violation of the Administrative Procedure Act

232.     AMB incorporates the allegations in the entirety of this Complaint as if fully stated herein.

233.     HUD was required to promulgate rules for implementation of the ACD/SFLS/DASP program through notice and comment rulemaking.

234.     HUD failed to promulgate rules governing the ACD/SFLS/DASP program through notice and comment rulemaking.

235.     If HUD believed it was not required to use notice and comment to promulgate rules governing the ACD/SFLS/DASP program, it failed to provide reasons as to why it may have believed it was not required to create rules using notice and comment rule making procedures.

236.     HUD's actions have caused and will continue to cause irreparable harm to AMB and other mortgage lenders who have executed indemnification agreements with HUD.

## COUNT II

### Violation of the Administrative Procedure Act

237.     AMB incorporates the allegations in the entirety of this Complaint as if fully stated herein.

238.     The ALJ's Decision is a final agency action.

239.     The Decision is arbitrary, capricious, and contrary to law because HUD did not have the legal authority to sell the Loan as part of the SFLS program since the program was contrary to HUD's regulations.

240.     The Decision is arbitrary, capricious, and contrary to law because HUD failed to exclude the Loan from the SFLS contrary to its own requirements.

241.     The Decision is arbitrary, capricious, and contrary to law because it fails to acknowledge that HUD willfully or recklessly disregarded its own policies and procedures by allowing loans with indemnification agreements to be included in the SFLS.

242.     The Decision is arbitrary, capricious, and contrary to law because the

Indemnification Agreement does not require AMB to indemnify HUD for the invalid claim in this case; because it did not properly discount the alleged amount AMB owes as required under the Indemnification Agreement; and because HUD acted contrary to the requirements of the Indemnification Agreement which excused AMB's obligations to pay.

243.     The Decision was contrary to and violated the statue and HUD's regulations governing administrative offset.

244.      HUD's actions have caused and will continue to cause irreparable harm to AMB and other mortgage lenders who have executed indemnification agreements with HUD.

**PRAYER FOR RELIEF**

245.     WHEREFORE, AMB respectfully requests that this Court:

a.   Set aside the Decision, and declare that the Decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706;

b.   Declare that HUD violated the Indemnification Agreement that was executed in connection with the Loan, FHA Case No. 374-5838647;

c.   Enjoin HUD from collecting any additional funds pursuant to administrative offset and/or referring the debt to Treasury for collection;

d.   Certify this matter as a class action;

e.   Issue a preliminary injunction restraining HUD, its officers, employees, agents, or servants from taking any actions against AMB, or the Lender Class, with respect to loans where there was an existing indemnification agreement in place and HUD subsequently included the loan in an ACD/SFLS/DASP sale;

f.   Return funds improperly collected by HUD pursuant to indemnification

agreements which are held in the MMI Fund;

g.  Award AMB its attorney's fees and expenses incurred in this action; and

h.  Grant such other relief as the Court deems just and proper.


Dated: March 16, 2020

  /s/ David M. Souders
David M. Souders (Bar No. 441491)
Brian M. Serafin (Bar No. 996019)
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036
Tel:  (202) 628-2000
Fax:  (202) 628-2011
Email: souders@thewbkfirm.com
       serafin@thewbkfirm.com


***Counsel for Plaintiff and the class of similarly situated mortgage lenders***