## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ASSOCIATED MORTGAGE BANKERS, INC.,**<br><br>  **Plaintiff,**<br><br> v.<br><br> **BEN S. CARSON, SR.,** *et al.***,**<br><br>  **Defendants.** | **Civil Action No. 20-cv-00744 (ESH)** |

## <u>MEMORANDUM OPINION</u>

Before the Court is a motion to dismiss brought by defendants the United States

Department of Housing and Urban Development ("HUD") and Ben S. Carson, Sr., in his official

capacity as HUD's Secretary (collectively, "defendants"). Plaintiff Associated Mortgage

Bankers, Inc. ("AMB") brings this action to seek review of a decision by an Administrative Law

Judge ("ALJ") that AMB is required under an indemnification agreement to pay defendants for

losses incurred following the payment of an insurance claim on a mortgage AMB originated.

For the foregoing reasons, the Court will grant defendants' motion to dismiss.

### BACKGROUND

## I.     FACTUAL BACKGROUND

### A.     HUD Mortgage Insurance and Asset Sales

In 1934, Congress created the Federal Housing Administration ("FHA"), which later

became a part of HUD's Office of Housing. (*See* Compl. ¶ 9, ECF No. 1). "FHA provides

mortgage insurance on loans made by FHA-approved lenders throughout the United States and

its territories." (*Id.* ¶ 10.) Essentially, "FHA mortgage insurance provides lenders with

protection against losses if a property owner defaults on their mortgage . . . because FHA will pay a claim to the lender for the unpaid principal balance of a defaulted mortgage." (*Id.* ¶ 12.) When loans subject to FHA mortgage insurance default, mortgage holders or servicers have a number of options to recoup their losses.  In some situations, they will foreclose on the property, make an insurance claim to FHA for losses incurred, and, in exchange, convey title to FHA. (*See id.* ¶ 15.)  In other cases, FHA will accept assignment of the mortgage in exchange for an insurance payout.  *See* 12 U.S.C. § 1710(a)(1)(A).

"In 2002, HUD began exploring a new program, known as Accelerated Claim Disposition ('ACD'), to dispose of collateral it received after paying insurance claims."  (Compl. ¶ 22.)  After a round of notice and comment rulemaking, HUD "published a final 'Notice of FHA Accelerated Claims Disposition Demonstration' which formally established the demonstration program," during which HUD would test the efficacy of this method of disposing of collateral.  (*Id.* ¶ 26 (citing 67 Fed. Reg. 66,038 (Oct. 29, 2002)).)  The program permitted HUD to pay accelerated claims on defaulted mortgages and, once the mortgages were assigned to it, sell bundles of mortgages to a private-sector bidder.  (*See id.* ¶ 24; *see also* ALJ Decision at 3, ECF No. 1-1.)  HUD conducted four sales under the auspices of this program from 2002 to 2005.  (*See id.* ¶ 31.)  HUD's goals for the ACD program were to "(1) reduce loss rates; (2) reduce the cost and time associated with claim dispositions; and (3) enhance the ability of HUD to assess risk and manage the FHA mortgage insurance fund."  (*Id.* ¶ 28 (quoting 67 Fed. Reg. at 66,041).)

While HUD stated that it would publish a summary of the findings from the ACD demonstration program in the Federal Register, no such summary was ever published.  (*See id.* ¶¶ 29-30.)  In 2006, HUD published an advance notice of proposed rulemaking to make the ACD

program "a permanent part of HUD's single family mortgage insurance programs." (*Id.* ¶ 36 (quoting 71 Fed. Reg. 32,392 (June 5, 2006)).)  However, in September 2007, HUD withdrew the proposed rulemaking, and never amended its regulations to reflect the changes made by the ACD program.  (*See id.* ¶¶ 44-45.)

HUD conducted subsequent sales similar to those completed during the ACD program. Between 2010 and 2012, HUD conducted six such sales under a program named Single Family Loan Sales ("SFLS").  (*See id.* ¶ 46.)  "In mid-2012, HUD reorganized ACD/SFLS into the Distressed Asset Stabilization Program ('DASP')."  (*Id.* ¶ 47.)  "Between September 2012 and the present, HUD has conducted eight bulk note sales under the DASP program, though HUD still referred to these sales by the name SFLS."  (*Id.* ¶ 50.)  One such sale is "SFLS 2013-2," which is at issue in this litigation.  The SFLS sales disposed of more than 100,000 loans with total unpaid principal balances of over $18 billion.  (*See id.* ¶ 51.)

HUD did not engage in notice and comment rulemaking for the SFLS or DASP programs.  (*See id.* ¶ 48.)  "In July 2017, the HUD Office of Inspector General ('HUD OIG') released a report finding that HUD was required to conduct notice and comment rulemaking to implement the SFLS/DASP program, but had failed to do so."  (*Id.* ¶ 55.)  HUD stated that it agreed with the report's recommendation and published an advance notice of proposed rulemaking on May 16, 2019.  (*See id.* ¶¶ 58-59.)  However, no further action has been taken on that rulemaking since the comment period closed in July 2019.

### B.    The Springer Loan

Plaintiff AMB is an FHA-approved mortgagee, meaning that it "originates mortgage loans, including mortgages that are and were eligible for insurance under the . . . [FHA] insurance program administered by HUD."  (*See id.* ¶ 2.)  "In 2012, HUD learned that AMB

3

violated FHA lending standards by originating mortgage loans, including the loan at issue in this case (the 'Springer Loan'), that did not comply with FHA lending standards."  (Mem. in Support of Defs.' Mot. to Dismiss ("Mot. to Dismiss") at 2, ECF No. 14-1 (internal citation omitted).) The Springer Loan faced a higher-than-usual risk of default, "thus subjecting HUD to an increased probability that it would be liable for an insurance claim from Springer Loan's holder and servicer, JPMorgan Chase Bank ('Chase Bank')."  (*See id.* at 3.)  "To resolve the increased risk to HUD, in December 2012 AMB signed and executed a single page agreement (the 'Indemnification Agreement'), agreeing to indemnify HUD for any losses on the Springer Loan." (*Id.*)  HUD indicated that if AMB had not signed the Indemnification Agreement, it would have referred AMB to the Mortgage Review Board, an outcome AMB wished to avoid.[1]  (*See* ALJ Decision at 3 ("HUD sent Petitioner a letter directing it to sign an Indemnification Agreement obligating it to indemnify HUD for any losses on the Springer loan; otherwise, HUD indicated it would refer the matter to its Mortgagee Review Board, which has the power to impose sanctions such as withdrawal of a mortgagee's FHA approval.").).

The Springer Loan's servicer, Chase Bank, signed a Participating Servicer Agreement ("PSA") in 2013 to participate in HUD's SFLS program.  (*See* Mot. to Dismiss at 3.) Participating in this bulk note sale meant that Chase would assign non-performing mortgages to HUD, which would pay Chase's insurance claims and then auction off the mortgage notes to a private-sector bidder.  (*See id.*)  Chase's PSA provided that no mortgages subject to an indemnification agreement could be included in the bulk sale; nevertheless, the Springer Loan

---

[1] AMB contests this reading of the Indemnification Agreement, saying "there is nothing in the Indemnification Agreement referring to this purported 'exchange.'"  (*See* Pl.'s Opp. at 30, ECF No. 17.)  However, AMB does not contest that HUD suggested it might refer AMB to the Board, and that AMB subsequently signed the Agreement.  In fact, AMB admits that it "may have felt threatened by the possibility of a referral to the MRB."  (*See id.* at 31.)

was included and accepted into HUD's SFLS 2013-2 Auction.  (*See id.*)

Bidding for the SLFS 2013-2 Auction began in June 2013.  "Four bidders submitted competitive bids for each note in a pool of 2,278 notes . . . ."  (*Id.*)  The highest bidder for the pool in aggregate also submitted the highest bid for the Springer Loan—"$360,531.24, approximately 73% of the unpaid principal balance of $491,590."  (*Id.*)  Around this same time HUD paid Chase's insurance claim for the Springer Loan, which was $520,979.86.  (*See id.*)

## II.     PROCEDURAL BACKGROUND

"In July 2014, pursuant to the terms of the Indemnification Agreement, HUD made a claim to AMB for its loss, demanding $160,448.62, the difference between the $520,979.86 insurance claim and HUD's $360,531.24 recovery on the Springer Loan."  (*Id.* at 4.)  In October 2014, "HUD issued a Notice of Intent to Collect by Treasury Offset for the alleged amount owed."  (Compl. ¶ 162.)  "On December 17, 2014, AMB filed a timely appeal with HUD's Office of Hearings and Appeals of HUD's decision to seek administrative offset."  (*Id.* ¶ 174.)  And, on December 16, 2016, the HUD Administrative Judge issued a decision concluding that AMB's debt is past due and legally enforceable.  (*See id.* ¶ 176-77.)  AMB appealed that decision to this Court.  In an opinion issued on January 4, 2019, this Court vacated the AJ's opinion pursuant to the Supreme Court's *Lucia v. S.E.C*, 138 S. Ct. 2044 (2018), on the grounds that the AJ who rendered the decision was not constitutionally appointed.  *See Associated Mortgage Bankers, Inc. v. Carson*, 2019 WL 108882, at *9 (D.D.C. Jan. 4, 2019). The Court then remanded the case to HUD "for a hearing before a different AJ who has been appointed in accordance with the U.S. Constitution's Appointments Clause."  *See id.*

On remand, the case was assigned to Administrative Law Judge Alexander Fernández. He issued an opinion on February 28, 2020, finding that AMB's debt is past due and legally

enforceable.  The ALJ concluded that HUD's actions did not relieve AMB of its duty under the

Indemnification Agreement to indemnify HUD and that even if the sale of the Springer Loan

breached the Agreement, HUD's actions did not harm AMB.  (*See* ALJ Decision at 8.)  Again,

AMB appealed that decision to this Court by filing a complaint on March 16, 2020.  Defendants

filed their motion to dismiss on June 2, 2020, and the motion is now ripe for review.

## ANALYSIS

## I.       LEGAL STANDARD

Under the Administrative Procedure Act ("APA"), a reviewing court may "hold unlawful

and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "It is well-

established that, when conducting review under the arbitrary and capricious standard, a court

may not substitute its judgment for that of agency officials; rather, [a court's] inquiry is focused

on whether the agency examined the relevant data and articulated a satisfactory explanation for

its action including a rational connection between the facts found and the choice made."  *Sloan v.

Dep't of Housing & Urban Dev.*, 231 F.3d 10, 15 (D.C. Cir. 2000) (internal quotation marks and

brackets omitted).   While a court's "deference to agency decisionmaking does not require

[it] . . . to countenance an agency's failure to consider relevant factors or clear errors of

judgment," *id.* (internal quotation marks, brackets, and ellipses omitted), the scope of a court's

review is nevertheless "narrow."  *See Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## II.      CHALLENGE TO ALJ DECISION

Plaintiff's primary challenge is to the ALJ's February 28, 2020 decision that its debt to

HUD is past due and legally enforceable.  Defendants argue that "the ALJ did not act arbitrarily

or capriciously in concluding that AMB failed to show any evidence, let alone . . . a preponderance of the evidence, that HUD's sale of the Springer Loan relieved AMB of its contractual duty to indemnify HUD for the amount of HUD's insurance loss on the loan." (*See* Mot. to Dismiss at 10.)  Whether the ALJ was correct to find that AMB's debt is past due and legally enforceable encompasses at least two sub-issues: (1) whether AMB's obligation to pay was triggered under the Indemnification Agreement; and (2) whether HUD materially breached the Agreement such that AMB was relieved of its duty to indemnify.  Lastly, the Court must assess whether the ALJ was correct to conclude that the sale of the Springer Loan via a note sale, rather than foreclosure and sale of the property, did not harm AMB.  The Court concludes that AMB's claim that the decision was arbitrary and capricious must be rejected.

### A.     AMB's obligation to pay under the Indemnification Agreement was triggered.

#### 1.     Chase's insurance claim was "valid."

The Indemnification Agreement provided that AMB would indemnify HUD for its investment "[i]n the event of a valid claim for insurance" on the Springer Loan.  (*See* Indemnification Agreement ¶ 1(a), ECF No. 1-5.)  AMB argues that because loans subject to indemnification agreements were not supposed to be sold in bulk note sales, Chase's claim for insurance in conjunction with offering the Springer Loan for sale in SFLS 2013-2 was not "valid." (*See, e.g.,* Pl.'s Opp. at 15-16.)  The ALJ concluded that "[t]he plain language and terms of the Indemnification Agreement . . . suggest that a 'valid' insurance claim is simply one that was brought about by [AMB's] origination of the Springer loan, during which process [AMB] engaged in noncompliant lending activities that increased the risk of just such a claim being filed." (ALJ Decision at 16.)

At the outset, the Court does not see how the term "valid" in the Indemnification

Agreement should be limited by a *different* word—"eligible"—in a *different* agreement—Chase's Participating Servicer Agreement.  (*See* Pl.'s Opp. at 16 ("Loans with indemnification agreements were not Eligible Mortgage Loans, should never have been subject to a claim, and HUD did not need to and should not have paid the claim.").)  While the Chase PSA had certain criteria for loan eligibility, the Indemnification Agreement had no similar limitations on the methods that could be used to dispose of property.  (*See* Defs.' Reply at 4 ("AMB's argument misses the mark by seeking to impose the narrower eligibility requirements of a particular sales procedure, when the Indemnification Agreement does not limit itself to any particular method of property disposition."), ECF No. 19.)  That the Springer Loan should not have been "eligible" under Chase's PSA—a different agreement executed over a year after AMB signed the Indemnification Agreement—is irrelevant to whether any claim made by Chase for insurance was "valid."

Furthermore, the Court agrees with the ALJ's observation that while "HUD's definition of a 'valid claim' as any FHA insurance claim filed by someone other than [AMB] is extremely broad," perhaps overly broad (*see* ALJ Decision at 16), the claim at issue here fits comfortably within the parameters of what the Indemnification Agreement was meant to cover.  So even if HUD's broad definition might encompass situations where an insurance claim should not be valid, such as those involving obvious fraud, as AMB suggests (*see* Pl.'s Opp. at 17), there are no such allegations relating to Chase's claim.  Chase assigned the Springer Loan to HUD to be sold as part of a package of non-performing loans.  And HUD is authorized by law to accept assignment of a note in exchange for payment of insurance benefits.  *See* 12 U.S.C. § 1710(a)(1)(A); *see also* ALJ Decision at 13 ("[T]he National Housing Act permits HUD, in

exchange for its payment of insurance benefits, to accept assignment of a note and sell it.").[2]  As

the ALJ concluded, the claim was one "that was brought about by [AMB's] origination of the

Springer Loan"  (*see* ALJ Decision at 16), and the outsized risk of default the loan created was

just the sort of situation the Indemnification Agreement was meant to cover.  Therefore, the

Court concludes that the ALJ's finding that Chase's claim was "valid" is not arbitrary and

capricious or contrary to law.

> **2.    HUD's request for indemnification after a note sale was within the
> Indemnification Agreement's parameters.**

The Indemnification Agreement provided that if AMB's duty to indemnify is triggered by

payment of a valid insurance claim, "indemnification will be in accordance with paragraph (b),

(c), (d), or (e), whichever applies."  (*See* Indemnification Agreement ¶ 1(a).)  Paragraph 1(b),

which applies to the reconveyance of the property by HUD to the mortgagee, does not apply

here; neither does paragraph 1(e), which applies in the case of a refinancing.  Plaintiff argues that

the only applicable paragraph is 1(c), which required HUD to sell the property (rather than the

note) to a third party.  The ALJ, on the other hand, concluded that paragraph 1(d), which covers

"any other case where a HUD/FHA insurance claim is pending or has been paid," governs the

---

[2] AMB argues that the ALJ should not have cited 12 U.S.C. §§ 1710(a)(1)(A), (g), as support for what HUD did here, as HUD purported to undertake the SLFS sales pursuant to its "demonstration authority."  (*See* Pl.'s Opp. at 14.)  However, the Court agrees with the ALJ that the Indemnification Agreement "does not prescribe the particular method by which HUD must dispose of whatever assets it has accepted in exchange for payment of the insurance claim."  (*See* ALJ Decision at 12.)  HUD accepted assignment of the mortgage note in exchange for payment of an insurance claim, as it is allowed to do by statute.  And regardless of whether what HUD did afterwards—selling the note—was supported by § 1710(g) or some other authority, it was contemplated by the Indemnification Agreement.  (*See* Indemnification Agreement ¶ 1(a) (listing as part of HUD's investment "expenses associated with the sale of a note").)  To the extent plaintiff argues that HUD's subsequent sale of the note was impermissible because HUD did not appropriately exercise its demonstration authority (*see* Pl.'s Opp. at 15 & n.15), this is a restatement of plaintiff's procedural claim, which this Court concludes it lacked standing to bring and was time-barred.  *See* Section III, *infra*.

sale of the note in this case.  (*See* ALJ Decision at 8.)  The Court agrees.

Contrary to plaintiff's argument, paragraph 1(c) does not apply here—HUD sold the note, *not* the property.  Moreover, the catch-all provision of paragraph 1(d) is broad enough to encompass HUD's actions, *i.e.*, paying an insurance claim "[i]n any other case."  Plaintiff argues that this paragraph does not apply because "by its plain terms, this subsection only applies to situations where at the time the Indemnification Agreement was executed—here, December 10, 2012—an insurance claim already 'is pending or has been paid.'"  (*See* Pl.'s Opp. at 24.)  Such a narrow reading of the Indemnification Agreement is unsupportable.  While the Court agrees that the paragraph's reference to "pending" insurance claims likely means the "known claims" referenced on the second page of the Indemnification Agreement, of which there were none (*see id.*), there is no reason to assume that the "has been paid" language only refers to claims already paid.  Indeed, paragraph 1(c) also references a situation where an insurance claim "has been paid" after the property "has been sold," but plaintiff does not argue that if HUD had not already sold the collateral property for the Springer Loan prior to the signing of the Indemnification Agreement, it could not have received indemnification under this clause.  The defendants' interpretation of the Indemnification Agreement's "has been paid" language, as encompassing claims for payment made after the Indemnification Agreement was executed, thus avoids the "absurd result" advocated by AMB.  (*See* Defs.' Reply at 4.)  The ALJ was thus correct to conclude that paragraph 1(d) applies.  (*See* ALJ Decision at 8.)

**B.     HUD did not breach the Indemnification Agreement by selling the Springer Loan via SFLS 2013-2.**

Defendants next argue that "HUD did not breach, much less materially breach, any contractual obligation that would relieve AMB of its obligation to indemnify HUD."  (*See* Mot. to Dismiss at 13.)  Even if a contract is breached, the breach must be material in order for a

plaintiff's claim to succeed, *i.e.*, the breach must "relate[] to a matter of vital importance . . . or . . . [go] to the essence of the contract and frustrate[] substantially the purpose for which the contract was agreed to by the injured party."  *America v. Mills*, 714 F. Supp. 2d 88, 100 (D.D.C. 2010) (internal quotation marks, citations, and brackets omitted).  "The standard of materiality for the purposes of deciding whether a contract was breached is necessarily imprecise and flexible."  *Id.* (internal quotation marks omitted).

AMB contends that defendants breached the Indemnification Agreement in at least two ways: (1) HUD sold the Springer Loan for a discount, which it failed to account for in its claim against AMB, and (2) the servicing requirements were breached when the Springer Loan was sold via a bulk note sale.  But on this topic, plaintiff devotes its argument principally to the claim that "HUD violated its policies and procedures and the ALJ's failure even to acknowledge . . . HUD's violation is both disheartening and clear error."  (*See* Pl.'s Opp. at 8.) While this argument is entirely untethered to the Indemnification Agreement and AMB's obligation to pay, the Court will construe it as a continuation of AMB's arguments before the ALJ regarding a breach of the implied covenant of good faith and fair dealing.  (*See* ALJ Decision at 17.)  The Court considers each of these issues in turn and determines that the ALJ's conclusion that HUD did not breach the Indemnification Agreement, must less materially breach it, was supported by substantial evidence.

### 1.    Servicing Requirements

The Indemnification Agreement requires that "[a]ll HUD requirements for servicing and payment of mortgage insurance premiums will be observed with respect to" the Springer Loan. (*See* Indemnification Agreement ¶ 1(a).)  AMB argues that the sale of the Springer Loan via a bulk note sale was a violation of the loan's servicing requirements, and that such a violation

relieved it of its obligation to pay.  (*See* Pl.'s Opp. at 31 ("AMB chose to sign the

Indemnification Agreement in reliance that HUD would properly supervise the servicing of the

Subject Loan, and only demand indemnification if HUD paid a 'valid claim,' as provided for

under the terms of the agreement that HUD itself drafted.").)  However, the ALJ concluded that

HUD's interpretation of "servicing requirements," as imposing a burden only on AMB and as

not so broad as to encompass requirements in third-party contracts that arose after the

Indemnification Agreement was signed, was more convincing.  (*See* ALJ Decision at 14-15.)

> The Court agrees.  HUD's own regulations provide that:

> [S]ervicing of insured mortgages must be performed by a mortgagee that is
> approved by HUD to service insured mortgages. The servicer must fully discharge
> the servicing responsibilities of the mortgagee as outlined in this part. The
> mortgagee shall remain fully responsible to the Secretary for proper servicing, and
> the actions of its servicer shall be considered to be the actions of the mortgagee.
> The servicer also shall be fully responsible to the Secretary for its actions as a
> servicer.

24 C.F.R. § 203.502(a).  Plaintiff argues that this regulation proves that *HUD* would ensure that

a servicer adheres to its servicing requirements.  (*See* Pl.'s Opp. at 30.)  However, the opposite is

true.  If "the actions of its servicer shall be considered to be the actions of the mortgagee," then

ostensibly a *mortgagee* will ensure its servicer's compliance with HUD requirements, as it bears

responsibility for non-compliant actions of its servicer.

> This also aligns with the placement of servicing requirements in the Indemnification

Agreement alongside the requirement to pay mortgage insurance premiums.  As defendants

argue, "[t]he coupling of servicing requirements with the payment of mortgage insurance

premiums, which are remitted by a servicer to HUD, is particularly indicative that these

requirements are imposed only on AMB, because it would defy logic to believe that HUD also

agreed to pay mortgage insurance premiums to itself."  (*See* Mot. to Dismiss at 13.)  The Court

agrees with the ALJ that such a construction is "compelling."[3] (*See* ALJ Decision at 14.)

### 2.     Failure to Account for a "Discount"

The Indemnification Agreement provides that, when calculating "HUD's investment" for purposes of indemnification, "any discount on the property" will be deducted from the total AMB must pay.  (*See* Indemnification Agreement ¶ 1(a).)  AMB argues that "because bulk note sales allow a limited number of qualified entities to purchase large pools of notes, the difference between what the property was worth ($550,000) and what HUD received ($360,531.24 or approximately 66% of the property's value) constitutes the discount" that should have been deducted from AMB's indemnification obligation.  (*See* Pl.'s Opp. at 22.)  The ALJ found that because the Indemnification Agreement only accounts for discounts "on the property," while what AMB alleges is a discount on the note, HUD was not wrong to refuse to make any such adjustment.  (*See* ALJ Decision at 12.)  Further, as discussed below, *see* Section II.C, *infra*, the ALJ made a finding, supported by substantial evidence, that the sale of the Springer Loan via SFLS 2013-2 did not cause there any "true 'discount'" on the note.  (*See* ALJ Decision at 12.)

At the outset, it was not arbitrary or capricious for the ALJ to reject AMB's contention that the bulk note sales necessarily resulted in discounted prices.  (*See* Pl.'s Opp. at 22 ("[T]he ALJ flatly ignore[d] the . . . reasons why a bulk note sale further depressed the value of the Springer Note.").)  HUD described these note sales as "'optimiz[ing] HUD's return on the sale of

---

[3] Because the Court is convinced that the ALJ was correct that HUD did not breach the "servicing requirements" clause of the Indemnification Agreement by selling the note via a bulk note sale, it need not address the ALJ's alternate conclusion that any such breach was not "material." (*See* ALJ Decision at 15 ("[T]he substantial benefit Petitioner reasonably expected to derive from the Indemnification Agreement was its ability to continue operating as a HUD-approved mortgagee without the threat of sanctions by the Mortgagee Review Board. Petitioner has not been deprived of this benefit, suggesting that there is no material breach of the contract that would excuse Petitioner from holding up its end of the bargain.").)

these Mortgage Loans, afford[ing] the greatest opportunity for all qualified bidders to bid on

them, and provid[ing] the quickest and most efficient vehicle for HUD to dispose of them.'"

(*See* ALJ Decision at 9 (quoting 78 Fed. Reg. 34,667, 34,668 (June 10, 2013)) (internal brackets

omitted).)  This is perfectly logical—why would HUD dispose of loans in a way that would

allow it to recoup less money than it could otherwise recoup by selling the property itself?

While the sale of a distressed note will undoubtedly be for less than the sale of the property, a

fact that the ALJ recognized (*see id.* at 9 ("[R]educed sales prices actually reflect merely that the

market is unwilling to purchase defaulted notes at their face value."), the sale of the note, rather

than the property, saved HUD various costs that would have accompanied such a method of

property disposition, *i.e.*, foreclosure, marketing, and holding costs, among others.  (*See id.* at

10.)

Moreover, the Court agrees with the ALJ that HUD's obligation in the Indemnification

Agreement to offset any "discount on the property" it received did not include the sort of

discount that AMB suggests.  In fact, the Indemnification Agreement provides an example of the

sort of "discount" it contemplated—the "Officer Next Door" program.  (*See* Indemnification

Agreement ¶ 1(a).)  This sort of offer to "reduce the price by a predetermined or set amount" (*see*

ALJ Decision at 9), differs from what HUD did here, which was to sell the Springer Loan in a

competitive-bidding process.  Plaintiff "seek[s] to define 'discount' to constitute any shortfall in

HUD's loss mitigation recoupment between the outstanding principal balance of the loan and its

sale price," which would eviscerate AMB's indemnification obligation.  (*See* Mot. to Dismiss at

16.)  The ALJ was correctly concluded that HUD did not fail to account for a "discount" when

calculating what AMB owed.

### 3.    Breach of the Covenant of Good Faith and Fair Dealing

Much of AMB's opposition is devoted to the argument that HUD violated its own

policies and procedures.  The Court considers this argument under the heading of breach of the

covenant of good faith and fair dealing.  The ALJ concluded that there was no such breach, as

"HUD's actions did not undermine Petitioner's reasonable expectations under the contract or

deprive Petitioner of the benefit of the bargain."  (*See* ALJ Decision at 17; *see also id.*

("Although selling the Note through the SFLS program was against HUD's own policy, there is

no suggestion the Note's inclusion in the sale was anything more than an innocent oversight, and

Petitioner suffered no harm as a result.").)

While "good faith" varies by context, it "emphasizes faithfulness to an agreed common

purpose and consistency with the justified expectations of the other party."  Restatement

(Second) of Contracts § 205.  "Bad faith, on the other hand, involves evasion of the spirit of the

bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of

a power to specify terms, and interference with or failure to cooperate in the other party's

performance."  *Daniel v. Smoot*, 287 F. Supp. 3d 74, 80 (D.D.C. 2018) (internal quotation marks

omitted).  The ALJ's conclusion that HUD's actions did not breach the Indemnification

Agreement's implied covenant of good faith and fair dealing is supported by substantial

evidence.  Contrary to AMB's contentions, the ALJ *did* recognize that selling the Springer Loan

in a bulk note sale was contrary to HUD's policies (*see* ALJ Decision at 17), but he concluded

that the Springer Loan's inclusion was a mere "innocent oversight."  (*See id.*)  AMB has

provided no facts to the contrary, nor has it explained why the ALJ was wrong to conclude that

there was no evidence of "evasion of the spirit of the bargain, lack of diligence and slacking off,

willful rendering of imperfect performance, abuse of a power to specify terms, [or] interference

with or failure to cooperate in the other party's performance."  (*See id.* (internal quotation marks omitted).)  With no such evidence, the ALJ was correct to find that HUD's "innocent oversight" (*see id.*), which caused no harm to AMB, *see* Section II.C., *infra*, provided no indication of bad faith.

### C.    HUD did not harm AMB when it sold the Springer Loan via SFLS 2013-2.

Lastly, the ALJ concluded that even if HUD breached the Indemnification Agreement by selling the Springer Loan via the SFLS 2013-2 sale, the amount HUD recouped was not significantly (if any) less than what it would have recouped by foreclosing on and subsequently selling the property, and thus, AMB was not harmed.  (*See* ALJ Decision at 8-12.)  The Court concludes that, contrary to plaintiff's allegations (*see* Pl.'s Opp. at 33 ("[T]he ALJ's rejections and/or refusal to acknowledge AMB's evidence [as to the sale price] as well as several erroneous findings that are unsupported by the record, were arbitrary and capricious.")), this finding was also supported by substantial evidence.[4]

First, AMB argues that the ALJ should have credited the Broker Price Opinion ("BPO") from April 2013 that valued the property underlying the Springer Loan (the "Springer Property") at $550,000.  (*See* Pl.'s Opp. at 33.)  However, the ALJ did not ignore AMB's allegations regarding that BPO.  He determined that, as HUD would not have been able to sell the Springer Property in April 2013 when the BPO was obtained by HUD, the sale price of $450,000 from

---

[4] AMB argues that "the government muddies the water" by conflating whether AMB was "harmed" (*i.e.*, whether the government actually recouped less by selling the Springer Note than it should have otherwise), and whether HUD materially breached the Indemnification Agreement.  (*See* Pl.'s Opp. at 32.)  Not so.  The ALJ concluded that HUD had not materially breached the Indemnification Agreement in any way.  (*See* ALJ Decision at 12-18.)  He also found that, even if HUD's sale *was* a breach, the breach had not harmed AMB because "the loss that HUD seeks to pass on to Petitioner through the Indemnification Agreement would not have been significantly reduced if HUD had sold the Springer property instead of the Note."  (*See id.* at 12.)  These are two distinct issues, both of which the ALJ properly analyzed.

approximately a year later was a better estimation of what HUD may have been able to recoup at the time of a foreclosure sale.  (*See* ALJ Decision at 11.)  AMB's alternative argument that the mortgage taken out on the Springer Property at that time for $499,000 is a better estimation of the value of the property was also refuted by the ALJ's findings—"[a HUD employee] testified that he spoke to representatives for the purchaser, who told him that when their company buys property, it typically obtains private short-term financing or bridge loans for amounts greater than the value of the property to fund both the purchase and holding and renovation costs."  (*See id.* at 11.)  In light of this evidence, the ALJ's conclusion that the sale price of $450,000 was the closest estimate of actual value is not arbitrary or capricious.

Next, AMB attacks the ALJ's rejection of its argument that if the sale price of $450,000 is a better estimate of the Springer Property's value, that is still considerably more than what HUD recouped.  (*See* Pl.'s Opp. at 34.)  However, AMB provides no evidence—let alone mentions—the costs HUD would have incurred to bring about a foreclosure sale.  (*See* Defs.' Reply at 9 ("AMB's Response does not cite evidence regarding the likely expenses associated with the foreclosure and sale of the vacant home securing the Springer Loan, or the likely length of time that such a procedure would require.").)  And, the ALJ accepted evidence from several HUD employees that foreclosed properties often sell below "full value."  (*See* ALJ Decision at 11.)  AMB argues that the study Brian Dillon, one of the HUD employees who provided evidence, cited supports a much lower foreclosure discount, and that the ALJ thus committed clear error by accepting Dillon's analysis.   But Dillon admitted that the numbers he chose for a so-called "foreclosure discount," 15% and 20%, and the study he cited, were given to the ALJ merely to bolster his conclusion that in his "experience as an appraiser . . . foreclosed properties are discounted."  (*See* Pl.'s Opp. at 27.)  Moreover, the study cited by Dillon does not refute

earlier studies that concluded that foreclosed properties may be discounted by as much as 15% to 20%. Instead, it critiques the fact that the discounts found in those studies may account for other variables at work in foreclosure sales, like "undesirable property condition," rather than just the stigma of a foreclosure sale, or what the authors refer to as the "foreclosure *per se* discount." (*See* Pl.'s App. at 52, ECF 18.) But in citing figures like 15% or 20%, Dillon was not attempting to say that his foreclosure discount *only* accounted for the stigma of a foreclosure sale—indeed, as Dillon stated in his declaration, the Springer Property *was* in less than ideal condition (*see id.* at 46 (stating that the property agent told him the Springer Property had "a leaky roof and a significant amount of deferred maintenance")), meaning that it likely would have been discounted more, not less. Given the record, the ALJ committed no error in accepting Dillon's conclusion that a sale of the Springer property would have been unlikely to recoup more than the Springer Loan's sale via bulk auction.

## III. HUD'S FAILURE TO PROVIDE NOTICE AND COMMENT

Defendants argue that AMB's first count, based on defendants' failure to provide notice and comment rulemaking on the bulk note sale program, should be dismissed for either lack of standing or untimeliness. The Court agrees that for both these reasons, plaintiff's first claim must be dismissed.

### A. Standing

To demonstrate "the irreducible constitutional minimum of standing," a plaintiff must allege (1) an injury in fact; (2) a "causal connection between the injury and the conduct complained of"; and (3) redressability, *i.e.*, that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). "The party invoking federal

jurisdiction bears the burden of establishing these elements." *Id.* at 561. Moreover, "unless there is a substantial probability . . . that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff, the plaintiff lacks standing." *Fla. Audobon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996).

Defendants argue that "AMB fails to show a concrete injury in fact that was fairly traceable to HUD's alleged failure to do notice and comment rulemaking." (Mot. to Dismiss at 20.) Plaintiff, on the other hand, argues that "[i]f AMB had known that HUD could waive the requirement that indemnified loans cannot be included in SFLS sales at any time and without any recourse, AMB could have proposed additional procedures for what would happen when indemnified loans are improperly included in an SFLS sale and how that impacts the indemnification obligation." (Pl.'s Opp. at 38.) But defendants admit that the Springer Loan should not have been included in the SLFS 2013-2 sale. (*See* Mot. to Dismiss at 3.) And "the SFLS procedures HUD adopted in fact excluded indemnified loans from inclusion in the loan sales program" (*id.* at 20), which should have ensured that the Springer Loan was not sold in the bulk auction.

As a result, the Court agrees that AMB's injury, the sale of the Springer Loan in a bulk auction and the resulting administrative offset order, is not fairly traceable to defendants' failure to utilize notice and comment rulemaking prior to restarting bulk note sales. While a plaintiff alleging a procedural-rights claim "need not demonstrate that, but for the procedural defect, the final outcome of the rulemaking process would have been different," it must "demonstrate a causal relationship between the final agency action and the alleged injuries." *See Ctr. for Law & Educ. v. U.S. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). And, AMB provides no

examples of what "additional procedures" could have helped to avoid what happened here.  The procedures adopted by defendants *already forbid* inclusion of loans subject to indemnification agreements in this type of sale.  As defendants contend, "it is pure speculation that the process of codifying a policy to exclude certain defaulted loans from note sales would eliminate an unintentional inclusion of a particular defaulted loan in a note sale."  (*See id.* at 21.)  While defendants' failure to utilize notice and comment rulemaking may have caused or increased other risks, it did not "cause a demonstrable increase" in the risk of the Springer Loan unintentionally being included in a bulk note sale, *see Fla. Audobon Soc'y*, 94 F.3d at 669, as the procedures that defendants had adopted already prohibited the conduct about which plaintiff is complaining.  Therefore, plaintiff lacks standing to bring this claim.

### B.  Statute of Limitations

Even if the Court assumes that, had HUD engaged in notice and comment rulemaking prior to engaging in the SFLS/DASP sales, a rule could have been promulgated that would have made it less likely that the Springer Loan would have been sold via a bulk auction, plaintiff faces another hurdle: the statute of limitations.  "APA challenges to agency action 'shall be barred unless the complaint is filed within six years after the right of action first accrues.'"  (Mot. to Dismiss at 21 (quoting 28 U.S.C. § 2401(a)).)  AMB argues that its claim is within the APA's statute of limitations "as it could not have brought the claim earlier absent the administrative offset order."  (*See* Pl.'s Opp. at 41.)

Because the APA makes reviewable "final agency action," *see* 5 U.S.C. § 704, a right of action under the APA accrues when an agency takes an action "'by which rights or obligations have been determined or from which legal consequences will flow.'"  *See Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  And as

"an agency's renewal of an earlier decision does not alter the status quo, it does not restart the statute of limitations." *Id.* (citing *Impro Prods., Inc. v. Block*, 722 F.2d 845, 850 & n.9 (D.C. Cir. 1983)).  Defendants argue that the relevant "final agency action" occurred in September 2010 at the latest, when HUD chose to restart bulk note sales without engaging in notice and comment rulemaking.  (*See* Mot. to Dismiss at 22 (citing Notice of Single Family Loan Sale (SFLS 2010), 75 Fed. Reg. 57,052 (Sept. 17, 2010)).)

Although the Springer Loan was not sold, and an administrative offset order was not entered, until several years after bulk note sales resumed, this does not mean that AMB could not have challenged HUD's failure to use notice and comment rulemaking earlier.  *See JEM Broadcasting Co., Inc. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994) (concluding, in the context of a different statutory limitation on review of administrative action, that "challenges to the *procedural lineage of agency regulations*, whether raised by direct appeal, by petition for amendment or rescission of the regulation or as a defense to an agency enforcement proceeding, will not be entertained outside" the statutory window (emphasis in original)).  Like the potential license applicants subject to the new rule in *JEM Broadcasting*, AMB, as an originator of FHA-insured loans, was surely aware of HUD's resumption of bulk note sales in 2010 and the potential of such sales to affect mortgages that AMB had originated.  *See id.* at 326.  Indeed, AMB argues that had HUD provided a period for comment, it would have "propose[d] changes which could account for what should happen if HUD did decide [to] include indemnified loans in the SFLS program."  (*See* Pl.'s Opp. at 38.)  There is no reason why AMB needed to wait for an administrative offset order for it to challenge its inability to make such comments.

As a result, AMB's claim accrued in 2010 at the latest, when HUD resumed bulk note sales.  Defendants assert that HUD made no changes to its procedures as articulated in 2010 prior

to the sale of the Springer Loan in 2013 (*see* Mot. to Dismiss 22), and AMB points to no such changes either.  At least one other judge to consider the bulk note sales program has concluded the same.  *See Washington v. U.S. Dep't of Housing & Urban Dev.*, 2019 WL 5694102, at \*31 (E.D.N.Y. July 29, 2019) ("[T]he final agency action that started the limitations clock was HUD's sale of notes pursuant to the [notes sales program] on September 22, 2010 . . . .").  The fact that HUD's use of a treasury offset against AMB was not approved by an administrative law judge until after the limitations period expired does not change the analysis.  *See id.* at \*30 ("The government's interest in finality outweighs a late-comer's desire to protest the agency's action as a matter of . . . procedure." (internal quotation marks omitted)).  Therefore, plaintiff's first claim is time-barred.

## CONCLUSION

For the reasons stated above, the Court will grant defendants' motion to dismiss plaintiff's complaint in its entirety.  A separate Order accompanies this Memorandum Opinion.


ELLEN S. HUVELLE
United States District Judge


Date: August 17, 2020